JAMES CHERESKIN,
ELIZABETH CHERESKIN,
& ANDREW CHERESKIN,

    Plaintiffs,

v.                              Case No. 06-C-1269

UNITED STATES OF AMERICA,

    Defendant.

## DECISION AND ORDER

Plaintiff James Chereskin, along with his wife and son, brought this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b). They allege that James Chereskin, a veteran and former JAG officer, received negligent medical treatment from VA staff after suffering a heart attack in December, 2002. Plaintiffs have now moved for partial summary judgment. They assert that the government has failed to put forth any expert testimony regarding the nursing care James received. In the face of the expert testimony they have proffered in support of their claims, Plaintiffs argue that the government's failure to offer a nursing expert to rebut this testimony means it has failed to create a genuine issue of material fact and cannot prevail at trial. Plaintiffs also seek sanctions for what they describe as a series of discovery abuses, spoliation of evidence and manufactured or doctored medical records. For the reasons given below, the motions will be denied.

**FACTUAL BACKGROUND**

James Chereskin was 44 years-old when he began experiencing chest pain.[1] He went to the Iron Mountain Veterans Affairs Medical Center (VAMC) for treatment, and he was soon transferred to the Zablocki VAMC (Milwaukee) on December 1, 2002. The next day, a cardiologist inserted two stents into one of his arteries to alleviate blockage. At about 3:30 p.m., Chereskin was complaining of chest pain. (Beronja Decl., ¶ 3.) In response, Nurse Beronja began administering a nitroglycerin drip, for which there had been a standing order issued. Later that afternoon, Nurse Beronja requested that morphine be administered in preparation for pulling sheaths out of Chereskin's arteries. This request was approved by a physician, but the medical records make it appear as though Nurse Beronja herself approved it.

After the stent procedure, Chereskin also began receiving an anticoagulant medication called integrilin via infusion. His records indicate that at 1:24 a.m. on December 3, an entry reading "completed in error" was made. Plaintiffs argue that this is evidence that James received an accidental overdose of integrilin, which was not revealed until discovery in this lawsuit. At 2:04 a.m., however, a note was added to explain that the previous entry of "completed" was made in error, because the infusion had in fact not yet completed. (Carroll Decl., ¶ 6.) According to the government, the infusion continued through the morning of December 3, and there was no overdose. Plaintiffs also assert that James was making complaints of pain throughout that night, but the government denies this and the records do not support any pain complaints apart from the one he

---

[1]The facts are taken in the light most favorable to the non-moving party.

made soon after the stent procedure was done.[2]

On the afternoon of December 3, Chereskin was released from the hospital. He states that upon release he only remembers seeing a female doctor, Irina Konan, and does not recall meeting with the cardiologist or anyone else. (Chereskin Decl., ¶ 5.) He was placed on a bus to return to Green Bay, but as soon as he returned home he had another heart attack. At that point he was helicoptered to Appleton, where he was told that the stents he had just received were fully blocked. (*Id.*, ¶ 10.) In this lawsuit, he asserts that the actions of the government physicians and nurses were negligent and resulted in the heart attack he suffered upon release on December 3.

## DISCUSSION

**I. Motion for Partial Summary Judgment**

As noted at the outset, Plaintiffs' motion for partial summary judgment asserts that because the government has not offered an expert witness on nursing care, it has failed to contest Chereskin's claim that the nursing care he received on the night of December 2-3 was negligent. As the Seventh Circuit has explained, Summary judgment is the "put up or shut up" moment in a lawsuit. *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 901 (7th Cir.2003). "Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1104 (7th Cir. 2008) (citing Fed.R.Civ.P. 56(e)).

---

[2] Apparently plaintiffs have made much of the fact that the word "PAIN" is stamped on some records. The government's witnesses have explained that this was a generic reminder stamped on many records to remind them to inquire about patients' pain. It is not, in other words, evidence that Chereskin was himself in pain.

3

Plaintiffs' nursing expert, Karen Duce, R.N., has worked in a hospital intensive care unit for fifteen years. In her opinion, Chereskin did not receive proper administration of anticoagulation medication after he received stents. She also opines that the nurses did not adequately inform the physicians about changes in his condition (namely, his complaints of chest pain and his EKG) on the night in question. Finally, she believes that the nurses were negligent for allowing Chereskin to be released on December 3 and for failing to advocate for further observation. (Duce Aff., ¶¶ 7-13.)

The substance of Duce's opinions is not presently at issue. Instead, Plaintiffs assert that Wisconsin law (which governs this Federal Tort Claims Act action[3]) requires expert testimony to establish the requisite standard of care because that standard would not be apparent to a layman. Because the Plaintiffs have supplied an expert opinion, and because the government lacks an expert on the proper standard of nursing care, Plaintiffs assert that the government has forfeited any defense it may have to Plaintiff's claim for nursing malpractice.

The United States does not quibble with the premise that expert testimony is generally required. Instead, it contests several of the facts underlying Duce's opinions, and it further notes that it *does* have medical experts whose testimony directly contests her opinion. Thus, the mere fact that it does not have a specific nursing expert is not fatal to its defense.

The United States is correct. The outcome of this case is not dependent solely on a battle between nursing experts. For example, Duce believes the nurses were negligent for not involving a cardiologist in Chereskin's care during the early morning hours of December 2-3. She asserts that given his complaints of chest pain and his EKG reading, the cardiologist should have been

---

[3]*See* 28 U.S.C. § 1346(b).

consulted. But the government contests the premise that Chereskin was complaining about chest pain at all. According to Nurse Beronja, Chereskin complained of pain only once, and that was immediately following the stent procedure. In her experience, it was not uncommon for a patient to have pain immediately following such a procedure. (Beronja Decl., ¶ 3.) Nurse Carroll also indicates that Chereskin reported no pain overnight, which is indicated by a zero over a ten on the charts. (Carroll Decl., ¶ 8.) In his view, "this patient had a good night." (*Id.*, ¶ 12.)

This line of testimony indicates that a specific nursing expert is not required. If the government's witnesses are believed, the need for a consult with the cardiologist was hardly as urgent as Nurse Duce asserts, and because the government's argument is based on the factual premise – that Chereskin was not reporting pain – rather than the quality of the treatment he received, the government will be able to show this with the witnesses it has offered without resort to a nursing expert.

The same is true with respect to the EKG. Although Duce opines that the EKG results warranted a cardiology consult, the government's expert physician, Dr. Wolff, asserts that the results showed no acute stent thrombosis, and the cardiologist, Dr. Ptacin, testified that the EKG showed only subtle changes and were in line with Chereskin's earlier tests. (DPFOF ¶¶ 56, 57, 59.) Once again, the government is able to contest the premise of Duce's testimony (that the EKG was a danger sign) without involving an expert in nursing care. This amply places the matter in dispute and requires resolution by the factfinder. The fact that there is no nursing expert is largely immaterial to the United States' defense, and it is certainly not fatal to its case. And, as discussed below, the other "evidence" Nurse Duce relies on for her opinions consists of inferences and leaps not warranted by the record. Accordingly, the motion for partial summary judgment will be denied.

5

## II. Motion for Sanctions

Plaintiffs move for sanctions on the basis of what they allege was essentially a criminal conspiracy on the part of government actors to manufacture evidence. They assert that the government hid records and created false records to cover up Chereskin's treatment. They also assert that the Defendants engaged in a number of discovery abuses. I will address these contentions briefly below.

The first matter to address is the timeliness of the government's response brief. The motion for summary judgment was filed on January 30, 2009, and the rules allow thirty days for a response. Civil L. R. 7.1(b). The response was not filed until March 4, however. Plaintiffs cite this tardiness as evidence of the government's aloofness and the general disregard it shows for the rules. As the government points out, however, it gets an additional three days for service under Fed. R. Civ. P. 6(d) and 5(b)(2) and (3). *Stanley C. v. M.S.D. of Southwest Allen County Schools,* 2008 WL 3288622, *3 (N.D. Ind. 2008) (e-filed documents are allowed additional three days for service). Thus, the response is neither late nor evidence that the government has engaged in a pattern of "blatantly ignoring" the rules.

The Plaintiffs' claim that the government destroyed and/or manufactured evidence does not fare any better. The Plaintiffs and their experts have identified a number of recently produced records that they believe are false. For example, one record lists Chereskin's age as 49, when in fact he was 44 at the time of the relevant treatment; other records refer to physicians whose treatment appears nowhere else in the files; and some contain dates for when Chereskin was not in the hospital. The government has offered good faith – even mundane – explanations for the alleged discrepancies in these records, and the details of these are not worth relating except to say that there

6

are no smoking guns here. The same is true for the other alleged discovery abuses. The most interesting record, which the Plaintiffs' brief describes in bold print, discloses an alleged accidental overdose of an "entire bag of integrillin [sic] medication" at 1:24 a.m. on December 3. This "catastrophic" event was essentially covered up by the government until recently, and in the Plaintiffs' view the event evidences the need for sanctions and establishes the nurses' negligence. But, as noted earlier, there is no real evidence that an overdose ever occurred. Nurse Duce apparently made that inference from a single entry in the record: "completed in error." As described above, however, it was not the entire bag of integrilin that was "completed" but the record itself. It was a computer entry error of a distinctly humdrum nature. (Carroll Decl., ¶ 7.) This was a minor snafu that could easily have been cleared up. As such, it is not a basis for sanctions, and in fact it reveals a level of recklessness on the Plaintiffs' part. Plaintiffs have accused long-term federal employees of massively overdosing a patient and then covering it up. These are not just discovery abuses but felonies. One would think that such an accusation would be based on more than a nurse's interpretation of a cryptic notation in a six-year-old medical record. With only the barest of inferences supporting this claim, the bald accusation is nearly as troubling as the underlying allegations themselves.

The veracity of the records may be an issue for the jury to determine. Plaintiffs will be able to contest the records with Chereskin's own recollections and testimony, and any discrepancies should be resolved by the factfinder. But the record, as it now stands, does not establish the kind of intentional misconduct that would warrant the extreme sanctions Plaintiffs are seeking, and I am satisfied it would be reversible error to award sanctions based on the thin record before me.

This is not to say, however, that the government's conduct may not warrant a lesser sanction.

7

While I am unable to find from this record that the government destroyed or hid incriminating records and manufactured new evidence, the record does suggest that the government's conduct in the case was not what it should have been. Despite multiple requests for a complete set of records as far back as 2004, a full and complete copy of the records relating to Chereskin's care and treatment at the Zabloski VAMC was not provided plaintiffs until after their experts had rendered their opinions from their review of the incomplete set of records that had been provided. (Decl. of Mary L. Woeher ¶¶ 4, 12.) The government admits that "[w]hen the medical and administrative records for James Chereskin were certified in September 2007, the ROI [Release of Information Office] certifying official did not realize that the Doctor's Orders and BCMA [Bar Code Medication Administration] records had not been printed and included." (Def.'s PFOF ¶ 79.) This, the government contends, was an "oversight" resulting from the failure of the software package used by the ROI to retrieve the records. (*Id.* ¶¶ 80- 85.)

The fact that the government did not intentionally withhold records, however, does not mean that it complied with its obligations under Fed. R. Civ. P. 26(g). As early as June 19, 2007, counsel for Plaintiffs conveyed to counsel for the government her concern that the records she had been provided were incomplete, noting that mandatory items were missing. Counsel also noted that the "the VA has a history of not providing all records and records appearing shortly before trial time." (June 19, 2007 email from Attorney Woehrer, Decl. of Lisa T. Warwick, Ex. 1.) Moreover, the delay in producing the complete set of records seems to have resulted in additional expense to the Plaintiffs: "As a result of ongoing record changes, additional expert time and fees were expended examining and comparing thousands of pages of records." (Woehrer Decl. ¶ 16.) Regardless of whether there is any merit to Plaintiffs' allegations that the records were doctored, if in fact

Plaintiffs did incur substantial additional litigation expenses as a result of the government's delayed disclosure, and if a Rule 26(g) certification that the records were complete was made without reasonable inquiry, the Court could consider a request for an award of attorneys fees and expenses caused by the late production. But that is not the relief Plaintiffs have requested, and for the reasons already stated, the record does not support the relief they have requested.

Accordingly, the motion for partial summary judgment and motion for sanctions are **DENIED**. The clerk is directed to set this matter for a telephone conference call to discuss further scheduling for trial.

**SO ORDERED** this 29th day of May, 2009.

/s William C. Griesbach
William C. Griesbach
United States District Judge