UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAMES CHERESKIN,
ELIZABETH CHERESKIN,
& ANDREW CHERESKIN,

          Plaintiffs,

    v.                                   Case No. 06-C-1269

UNITED STATES OF AMERICA,

          Defendant.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND ORDER FOR JUDGMENT**

       This case arises under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b). Plaintiff

James Chereskin, a Marine veteran and former Navy JAG officer, along with his daughter and son,

seek damages they claim they incurred as a result of negligent medical treatment James received

from Department of Veteran Affairs physicians and staff at two separate facilities after suffering a

minor heart attack in December, 2002. Chereskin alleges that physicians at the Iron Mountain

Veterans Administration Medical Center ("VAMC") in Iron Mountain, Michigan, and the

physicians and staff at the Zablocki VAMC in Milwaukee, Wisconsin were negligent in the care and

treatment they provided in response to his heart attack and, as a result, he suffered a second and

more serious heat attack within hours of his discharge from the Zablocki VAMC. The case was

tried to the court over a four-day period from December 14 through December 17, 2009. The record

was kept open until January 5, 2010, to allow one of Plaintiffs' experts to address evidence that had

inadvertently not been disclosed. What follows are my findings of fact and conclusions of law.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      James Chereskin was born on November 28, 1958, in Iron Mountain, Michigan, and grew up on a farm in northern Wisconsin. Following his graduation from high school in 1976, he joined the Marines. After three years of service, he attended college and then entered law school, graduating from the University of Wisconsin Law School in 1986 as a member of the Office of the Judge Advocate General's ("JAG") Corps of the United States Navy. He was honorably discharged in approximately July of 1992.

2.      Chereskin has two children, Elizabeth (dob: XX-XX-XX) and Andrew (dob: XX-XX-XX), both of whom are now adults. Chereskin and the mother of his children divorced in 1992 at or around the time he left the service. After the divorce, the children lived with their mother in Orlando, Florida. Chereskin, who had begun practicing law some distance away in Daytona Beach, had visitation every other weekend and for a couple of weeks in the summer. At times he would take his children to visit his family in Wisconsin. In December 2001, Chereskin moved back to Wisconsin and joined a law firm in Shawano, where he practices primarily criminal law. His children, now 23 and 21, reside in central Florida.

3.      Chereskin first complained of chest pain in December of 2000. Records from a VA outpatient clinic in Orlando ("Orlando OPC"), Florida show that Chereskin was seen by Dr. Edward K. Fraser on December 12, 2000. Chereskin reported "occasional episodes of vague chest tightness across the anterior chest" over the past six months. (Ex. 1006 at 1132.) Chereskin reported that it only occurred when he was under a lot of stress, especially at work and did not appear to be exercise related. Cardiac risk factors of tobacco smoking (half pack per day) and elevated blood pressure (160/102) were noted. His weight was 265 pounds. The plan set out by Dr. Fraser included:

2

(1) discontinue tobacco use; (2) discuss low sodium diet and weight loss and use of a home blood pressure cuff to monitor blood pressures; (3) chest x-ray and stress test; (4) blood work-up and cardiac profile. Chereskin was told to call 911 should he have increasing symptoms prior to the stress test. (Id. at 1133.)

4.      Laboratory results from Chereskin's blood test revealed a total cholesterol count of 257 mg, with an LDL count of 170. (Id. at 1115.) He failed to appear for the scheduled stress test because he thought it had been cancelled. (Id. at 1040.) He spoke with a social worker during a January 23, 2001 follow-up visit and stated that his ongoing divorce proceedings had been very stressful, as was his litigation practice at a large firm. The social worker explained the effect of stress on his heart with his high blood pressure, and he stated that he had left the large firm, was working out of his home, and had no health insurance. The social worker also discussed the lack of emergency and hospital care at the clinic, and he indicated he would consider that for the future. (Id. at 1039-40.) Chereskin underwent a rescheduled stress test on February 2, 2001, to which he had a normal response other than elevated blood pressure. The resulting recommendations were for aggressive treatment of his significant hypertension and reduction of his cholesterol with a lipid lowering agent such as a statin. Chereskin was advised regarding primary prevention of heart disease and counseled about weight reduction, proper exercise, and a low fat diet. (Id. at 1138.) He was prescribed Atenolol for his hypertension, but the records do not disclose whether he elected to reduce his cholesterol through medication, as opposed to diet. He continued smoking. (Id. at 1124.)

5.      The Orlando OPC records contain notes of two follow-up visits in 2001, but no complaints of chest pain until November 25, 2002, when Chereskin called the VA's Telcare, a toll-

3

free medical advice line for veterans, and reported that he had been having chest pain over the past two days. (Id. at 1031.) Chereskin stated he had moved from Florida and had been living in Wisconsin since January of 2002. He reported he experienced similar symptoms about two weeks earlier, and had not been taking his blood pressure medication for the last nine months. Chereskin stated his blood pressure was 180 over 110, and that he had tingling to the fingers of his left arm. The nurse advised him to call emergency medical services but he refused, indicating he had no insurance. When the nurse explained the seriousness of his symptoms and again advised him to call emergency medical services, he agreed to do so. (Id. at 1032.) The record does not reflect whether he did or not, and neither party offered testimony concerning this incident at trial.

6.      Three days later on the afternoon of November 28, 2002, his 44th birthday, following Thanksgiving Day dinner at his sister's home in northern Wisconsin, Chereskin experienced discomfort in his chest. He attempted to relieve it by lying on the floor, but it would not go away. His mother and sister were leaving to go play cards at the home of one of his aunts, but by that time Chereskin was feeling a little nauseous and "queasy" so he decided not to go with them. Instead, he went back to the family hunting cabin where he had been staying. At approximately 7:00 p.m. or 8:00 p.m., he began experiencing very serious chest pain which he described as "stabbing." He took three aspirin and the pain went away. He then fell asleep and had an uneventful night. When he awoke the following morning, however, he again began feeling the way he did at his sister's house the previous day with chest pain and "queasiness." He proceeded to the Iron Mountain VAMC.

7.      At approximately 9:15 a.m. on November 29, 2002, Cherskin presented at the Iron Mountain VAMC with a complaint of chest pain over the left breast. (Ex. 1E at 735.) He said that

4

he had the same pain, which he described as a "dull ache," at noon the previous day. He stated he started having occasional pain about two weeks ago but it had become more frequent and of longer duration. (*Id.*) An Electrocardiagram ("EKG") showed an elevated ST-segment, and he was admitted with a diagnosis of acute myocardial infarction ("MI"). His chest pain subsided after nitroglycerine was administered, and his condition was stabilized. (*Id.* at 734.) Given the fact that the onset of symptoms was more than twelve hours before presentation and his pain resolved when nitroglycerine was administered, Dr. Edward Perez-Conde, the emergency physician, in consultation with Dr. Suwat Virulhsri, the cardiologist on duty, elected to continue therapy that had been initiated and transfer him to Zablocki VAMC in Milwaukee on Monday for cardiac catheterization. Chereskin spent two days in intensive care at the Iron Mountain VAMC and was then transported by ambulance to the Zablocki VAMC on Sunday, December 1, 2002. The following day, Chereskin underwent a cardiac catheterization which revealed a blockage in his left anterior descending artery. Dr. Michael J. Ptacin, a cardiologist who teaches at the Medical College of Wisconsin and a VAMC staff physician since 1980, performed percutaneous coronary angioplasty ("PCA") and inserted two stents into the artery which restored blood flow to normal.

8.  Chereskin was discharged from Zablocki VAMC Intensive Care Unit ("ICU") on the afternoon of December 3, 2002, at approximately 3:30 p.m. and took the VA transport van or bus to Green Bay. Upon arrival, a friend drove him to his home in Bonduel, Wisconsin. On the evening of December 3, 2002, shortly after his arrival home, Chereskin began experiencing severe chest pain. He telephoned the rescue squad and was transported to Shawano County Medical Center where he was administered nitroglycerin and transported by helicopter to the Appleton Medical Center for further evaluation. Although Chereskin was suffering from a second and more severe

5

heart attack, he was initially treated for pericarditis, a swelling and irritation of the pericardium, which is the sac that surrounds the heart. Following a rise in his cardiac enzymes, a second cardiac catheterization was performed in the late morning of December 4, 2002, which confirmed that one of the newly implanted stents was fully occluded by a thrombus (blood clot) formation. In other words, Chereskin had sustained an acute stent thrombosis. A second angioplasty was performed and a new stent was placed at the proximal end of the previous stent. Chereskin was discharged the following day.

9.     Chereskin suffered permanent damage as a result of the second heart attack. One measure of the heart's function is the ejection fraction, the percentage of blood that is ejected from the ventricle with each contraction. A normal ejection fraction is above 50%. Following the initial heart attack, Chereskin's ejection fraction was 56%. Following the second heart attack, it was reduced to 44%. It has since declined further to 37%.

10.     Plaintiffs allege that the Iron Mountain and Zablocki VAMCs were negligent in the care and treatment they provided James Chereskin from his admission on November 29 through his discharge on December 3, 2002. They first claim that doctors at the Iron Mountain VAMC were negligent in failing to properly administer emergency treatment or immediately transfer Chereskin to a medical facility capable of performing emergency PCA. The failure to do so, plaintiffs contend, caused Chereskin unnecessary pain and risked serious and permanent damage to his heart. Their primary expert concedes, however, that the failure to immediately transport Chereskin to a different facility did not in fact result in any measurable permanent damage.

11.     Plaintiffs primary claim is against the physicians and staff at the Zablocki VAMC in Milwaukee. They claim that his second and more severe heart attack was caused by the negligent

6

care and treatment he received there. Plaintiffs offer several criticisms of the care Chereskin received at Zablocki VAMC that they contend resulted in his acute stent thrombosis. Based on the incomplete medical records they were initially provided, Plaintiffs claim that Chereskin was not given the prescribed eighteen hours of the anticoagulant Integrelin and other medications that are used to prevent the formation of a thrombus or blood clot. In addition, or alternatively, they contend that Dr. Michael Patacin, the cardiologist who performed the angioplasty at Zablocki, used an undersized stent which resulted in a thrombus forming hours after the procedure was completed. Plaintiffs further contend that there were indications of a problem with the stent almost immediately after the procedure was completed and Chereskin was returned to the ICU. Chereskin claims he complained of chest pain multiple times throughout the evening, but instead of notifying the cardiologist, the VA nursing staff simply administered nitroglycerine. Plaintiffs argue that the fact that Chereskin had chest pain that required nitroglycerine after the angioplasty and stent placement was a clear sign that something was not right and the cardiologist should have been notified. Plaintiffs also contend that the fact that EKGs were taken after the procedure, including one taken at 3:30 a.m. the following morning, confirm that Chereskin was experiencing chest pain, even after the nitroglycerine drip was stopped, again indicating a problem with the stent. Given these events, Plaintiffs contend that Chereskin should not have been discharged from the hospital on the afternoon of December 3, 2002. Had the nursing staff and physicians responded appropriately to these clear indications of a problem, they contend, Chereskin either would have been returned to the cath lab and the newly formed clot discovered before it blocked his blood flow, or at least he would have been at the hospital when the second heart attack occurred so that blood flow could have been restored before serious damage occurred.

7

12.     Plaintiffs contend that the combined negligence of the Zablocki medical personnel caused Chereskin's second heart attack. The second heart attack, they contend, resulted in the substantial and permanent damage to his heart. Chereskin seeks compensatory damages for past and future medical expenses, loss of past earnings and future earning capacity, pain, suffering, and disability. His children seek damages for loss of their father's society and companionship.

13.     This court has jurisdiction over this matter because it arises under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680. Under the FTCA, the United States is generally liable in the same manner and to the same extent as a private individual under like circumstances for the negligent or wrongful act or omission of any employee of the government while acting in the scope of employment. 28 U.S.C. §§ 2674-75. In deciding whether the government is liable, the law of the state in which the alleged tortious incident occurred is to be applied. Although a portion of the negligence is alleged to have occurred in the State of Michigan, the most significant events occurred in the State of Wisconsin. Neither party has argued that Michigan's law applies or is substantially different than the law of Wisconsin. I will therefore apply Wisconsin law.

14.     Under Wisconsin law, the plaintiff in a negligence case carries the burden of proof. To recover, the plaintiff must prove four elements: (a) a duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) actual loss or damages resulting from the injury. *White v. United States*, 148 F.3d 787, 793 (7th Cir. 1998). The plaintiff must prove each element to a reasonable certainty by the greater weight of the credible evidence. Wis. JI - Civil 200. In treating and diagnosing a patient's condition, a doctor is required to use the degree of care, skill, and judgment which a reasonable doctor would exercise in the same or similar circumstances, having due regard for the state of medical science at the time

8

the patient was treated or diagnosed. An interventional cardiologist is required to use the degree of care, skill, and judgment which reasonable interventional cardiologists would exercise in the same or similar circumstances, and nurses are required to use the degree of care, skill, and judgment which reasonable nurses would exercise in the same or similar circumstances. Neither a doctor nor a nurse, however, is negligent for failing to use the highest degree of care, skill, and judgment or solely because a bad result may have followed his or her care and treatment. Wis. JI - 1023.

15.     Four extremely well-qualified physicians testified as expert witnesses over the course of the trial. Three testified on behalf of the Plaintiffs. They include Dr. Paul D. Casey, Dr. Richard E. Silberman, and Dr. Peter A. Fergus. Dr. Casey, who received his medical degree at George Washington University in 1986, is an emergency physician and the Director and Chairman of the Emergency Medicine Department at Bellin Hospital in Green Bay, Wisconsin. He is also Medical Director of the Chest Pain Center at Bellin. (Ex. 24A.) Dr. Silberman is a 1966 graduate of the University of Wisconsin Medical School and completed an internship in internal medicine at D.C. General Hospital. He then attended the School of Aerospace Medicine, and after several years as a flight surgeon, he completed a fellowship in Cardiology and returned to Milwaukee where he practiced as an invasive cardiologist until his retirement in 2004. Dr. Silberman was a past Chief of Cardiology at St. Luke's Medical Center in Milwaukee and an Assistant Clinical Professor of Medicine at the Medical College of Milwaukee. Dr. Fergus is a Green Bay cardiologist who received his medical degree from the University of Rochester School of Medicine and Dentistry in 1970 and was a resident in cardiology with the Harvard Medical Service from 1973 to 1974. He was also a clinical fellow and instructor at the Harvard Medical School in 1974-75. After more than thirty years of work as an invasive or interventional cardiologist who performed numerous

9

catheterizations, angioplasties and stent placements, Dr. Fergus now works as a consulting cardiologist. He has been treating Chereskin since December of 2007. Plaintiffs also called as an expert witness on the standard of care for nurses Karen Duce, a registered nurse currently working in the Neuroscience Intensive Care Unit at Froedtert Memorial Lutheran Hospital in Milwaukee.

16.     Dr. Matthew R. Wolff was called by the defense. Dr. Wolff is Chief of the Division of Cardiovascular Medicine at the University of Wisconsin Hospital and Clinics. He is also the Director of the Oscar Rennebohm Cardiovascular Research Laboratories and of the Interventional Cardiology Fellowship Program and the University of Wisconsin Medical School. He is a 1985 graduate of the Johns Hopkins University School of Medicine and completed his postgraduate training in cardiology there as well. As a Staff Interventional Cardiologist at the U. W. Hospitals and Clinics, Dr. Wolff performs approximately 400 diagnostic cardiac catheterizations per year and 250 angioplasties and stent procedures. Dr. Wolff is also a Governor of the American College of Cardiology, Wisconsin Chapter, and serves on the American College of Cardiology's Interventional Council, which is one of several committees that establishes and reviews the American College of Cardiology/American Heart Association ("ACC/AHA") Guidelines for angioplasty procedures. He is listed as a co-author of thirty-three published articles in his field and forty abstracts. Also relevant to this case, Dr. Wolff is Chair of the American Heart Association's Mission Lifeline Project for the State of Wisconsin, which seeks to establish regionalized systems to provide state-of-the-art care for heart attack patients in rural areas of the State.

17.     Drs. Casey, Silberman, and Fergus all testified that the treatment provided Chereskin at the Iron Mountain VAMC did not meet the standard of care for cardiac patients that existed in 2002. At the time he presented, Chereskin was having an acute myocardial infarction with ongoing

10

chest pain. An EKG showed ST segment elevation, an undisputed sign of a heart attack most likely caused by blockage of an artery. Even though Chereskin had been having chest pain off and on for several weeks, including the previous evening, there were clear indications he was in the midst of a heart attack when he was seen in the emergency room of the Iron Mountain VAMC on the morning of November 29, 2002. Drs. Casey, Silberman, and Fergus all testified unequivocally that under the standard of care for emergency physicians and cardiologists that existed at the time and still exists, Chereskin should have been immediately transferred to a tertiary care medical facility where an interventional cardiologist and cardiac surgery was available. Dr. Casey testified that Bellin Hospital in Green Bay regularly receives patients with similar symptoms from Dickinson Memorial Hospital, which is also located in the Upper Peninsula of Michigan, via helicopter. Dr. Casey testified that Chereskin continued to have pain even after admission until the intravenous nitroglycerine was titrated to 60 micrograms per minute. He also testified that the EKGs on the day of his admission indicated a progression of ST elevation. Dr. Silberman likewise testified that under the then-existing standard of care, arrangements should have been immediately made to transfer Chereskin to another facility. He explained that an ST elevation on EKG indicates an anteroseptal infarction which leads to death of heart muscle in the front wall of the heart. The front wall is the most important for the pumping action of the heart. The fact that Chereskin was still experiencing chest pain was significant because it is a sign that still living muscle is being deprived of oxygen. Under these, circumstances, it is essential to move quickly to open the artery as soon as possible. Since the Iron Mountain VAMC lacked the physicians and facilities needed to accomplish that, Dr. Silberman thought that immediate transfer to an appropriate facility should have been arranged. Dr. Fergus agreed. Dr. Fergus testified that 60 micrograms per minute, the amount of nitroglycerine

11

eventually administered to Chereskin to alleviate his chest pain, is almost two-thirds of the maximum dose he uses. The fact that Chereskin had pain on presentation and continued to have pain thereafter, Plaintiffs' physicians experts testified, warranted immediate transfer.

18. Dr. Wolff disagreed with Plaintiffs' physician experts. He testified that the treatment provided by the Iron Mountain VAMC was consistent with the ACC/AHA Guidelines for the Management of Patients With Acute Myocardial Infarction. Under the guidelines, the first question was whether a thrombolytic, or clot busting, agent should have been administered. Dr. Wolff testified that the failure of the medical personnel at Iron Mountain VAMC to administer an intravenous thrombolytic drug upon presentation was reasonable under the ACC/AHA Guidelines in light of the circumstances they confronted. Chereskin presented more than twelve hours after the onset of chest pain, Dr. Wolff noted, and his chest pain responded quickly to sublingual and intravenous nitroglycerine. According to the Iron Mountain VAMC records, Chereskin initially reported he had been experiencing chest pain since noon the previous day. (Ex. 1E at 735.) He later explained that he had been experiencing episodes of chest pain on and off for about two weeks and had his most severe episode the previous evening at approximately 7:00 p.m. when it became steady. (Id. at 731.) The pain then subsided, and he slept for ten hours, but it was still there in the morning. (Id. at 724.) After he was given nitroglycerine sublingual and two "baby" aspirin at 9:42 a.m., his chest pain decreased to three on a scale of ten from an initial score of seven. He was given a second and a third nitroglycerine tablet, and by the time he arrived at the ICU, he was chest pain free. (Ex. 1E at 736, 734, 724.)

19. Under these circumstances, Dr. Wolff explained, thrombolytic drug therapy, though considered, was rejected as a response to Chereskin's condition. Under the Guidelines,

administration of thrombolytic agents for ST segment elevation MI where the time to therapy is greater than twelve hours is a Class IIb indication. (Ex. 1003 at 1347.) Class II indications are those "conditions for which there is conflicting evidence and/or a divergence of opinion about the usefulness/efficacy of a procedure or treatment." (Id. at 1336.) A Class IIb indication is one in which the "usefulness/efficacy is less well established by evidence/opinion." (Id.) An additional comment on the use of thrombolytic therapy where the patient presents more than twelve hours after onset of symptoms notes that "[g]enerally there is only a small trend for benefit of therapy after a delay of more than 12 to 24 hours, but thrombolysis may be considered for selected patients with ongoing ischemic pain and extensive ST elevation." (Id.) Dr. Wolff testified that Chereskin's ST elevation was not extensive and his chest pain responded completely to initial therapy with nitroglycerine. Under these circumstances, and given the fact that he was hemodynamically stable, Dr. Wolff concluded that the decision not to administer a thrombolytic agent was reasonable. (Ex. 1001 at 3.) Dr. Casey agreed with this aspect of Dr. Wolff's opinion. (Ex. 24B at 5.)

20.  Dr. Wolff also thought that the failure to immediately transfer Chereskin to a tertiary care medical facility where an interventional cardiologist and cardiac surgery was available was also reasonable. Dr. Wolff testified that such a transfer was contraindicated for two reasons: (1) because Chereskin's chest pain responded quickly to the initial therapy, thereby eliminating the need for emergency PCA; and (2) transfer to such a facility for emergency PCA or coronary angioplasty is only called for under the guidelines if it can be "performed in a timely fashion by individuals skilled in the procedure and supported by experienced personnel in high-volume centers." (Ex. 1003 at 1348.) Under the Guidelines, timely fashion is within 90 minutes of diagnosis of an acute MI. (Id. at 1349; Ex. 51 at 2352.) Dr. Wolff testified that the standard requires an ability to insure that the

13

coronary artery can be opened up with a balloon within 90 minutes of the time the patient presented to the original hospital. He testified that very few medical centers in rural Wisconsin or Michigan have the ability to meet this standard. In fact, he testified that in 2002 no hospital system in the State of Wisconsin had a coordinated helicopter transport system to routinely transport patients with heart attack so they could receive angioplasty within 90 minutes of presentation. Even today, he testified, rural hospitals and medical centers cannot routinely meet the ACC/AHA goal of 90 minutes from door to balloon time. As a result, Dr. Wolff testified that the standard of care at most rural hospitals is to provide thrombolytic therapy when appropriate but not to air transport patients to larger medical centers. Where the standard cannot be met, Dr. Wolff testified it is reasonable to work to stabilize the patient's condition and arrange for a more orderly transfer once the patient is stable.

21. I find Dr. Wolff's testimony more convincing on the question of whether the decisions made by the physicians at the Iron Mountain VAMC were below the standard of care for reasonable physicians and cardiologists. His experience is significantly broader than that of the Plaintiffs' experts, particularly in view of his involvement with Project Lifeline. Plaintiffs offered no evidence that the 90-minute goal set forth in the ACA/AHA Guidelines could have been met in this case. Absent such evidence, and in light of Dr. Wolff's testimony that no hospital system in the State of Wisconsin had a coordinated helicopter transport system to routinely transport patients with heart attack so they could receive angioplasty within 90 minutes of presentation, the decision to attempt to stabilize the patient rather than seek immediate transfer seems reasonable. Chereskin's chest pain quickly responded to nitroglycerine, and within a short period of time, he was chest pain free. Although the records indicate he had two transient periods of chest discomfort following his

14

admission, they were treated by increasing the rate of infusion of nitroglycerine and resolved spontaneously. While Drs. Casey, Fergus and Silberman would have insisted on a higher standard, I am satisfied from Dr. Wolff's testimony that the care provided by Iron Mountain VAMC was within the range that would be provided by a reasonable emergency physician and cardiologist under the circumstances then and there existing. The fact that some hospitals are able to provide helicopter transport to a regional medical center where interventional cardiologists are standing by and catheterization labs and cardiac surgery are available, does not mean that rural hospitals or medical centers should be held liable when they cannot.

22.    Even if the failure to immediately transfer Chereskin was negligent, it resulted in no injury, loss or damage. Both Dr. Wolff and Dr. Fergus testified that the fact that Chereskin's ejection fraction upon his arrival at Zablocki VAMC was 56% indicates that he suffered little if any damage to his heart as a result of the first heart attack. Dr. Wolff noted that Chereskin's initial Troponin reading on the morning of November 29 was low, and the follow-up reading on November 30 was decreased. Troponin is an enzyme associated with heart attacks and generally peaks approximately 24 hours after the onset of chest pain. According to Dr. Wolff, Chereskin's Troponin readings suggest that his heart attack was mild and essentially completed upon presentation to Iron Mountain VAMC. (Ex. 1001 at 4, ¶ 2.) Although Chereskin contends that he suffered additional pain as a result of the delay, the records show that but for the two transient episodes referred to above, Chereskin remained essentially chest pain free after his admission to Iron Mountain VAMC. The pain he experienced after admission to the Iron Mountain VAMC appears far less severe than the chest pain he was having before electing to proceed to the hospital for evaluation and treatment. Accordingly, Chereskin is not entitled to recover on his claim against Iron Mountain VAMC.

15

23.     I also find that the catheterization and stent placement performed at Zablocki VAMC was within the standard of care for a reasonable interventional cardiologist.  On this issue, as well, there was a dispute between the expert witnesses.  Plaintiffs' primary criticism of the procedure itself is that the stents used by Dr. Ptacin were too small.  Dr. Fergus testified that it is essential that the stent appose the sides of the artery in order to avoid problems such as re-clotting.  In other words, there should be no space between the artery walls and the stent, once it is fully expanded.  If a space exists, Dr. Fergus testified that a clot or thrombus can form quickly, leading to acute stent thrombosis.  In Dr. Fergus' opinion, that is precisely what occurred in this case.  Dr. Ptacin used an undersized stent that temporarily returned flow to the artery, but a clot formed and caused a second heart attack within hours of his discharge from Zablocki.  Although Dr. Silberman did not opine on the size of the stent in his initial reports, he also testified that in his opinion the stent used by Dr. Ptacin was too small.

24.     Dr. Wolff, however, testified that stent size is determined by the physician based upon the appearance of the artery when dye is injected into it during the catheterization in relation to the catheter and the balloon used to open the artery.  From this information, Dr. Wolff testified, a reasonable cardiologist uses his judgment and experience to determine the size of stent needed for the procedure.  Dr. Wolff emphatically rejected Dr. Fergus' claim that Dr. Ptacin should have known from the mere fact that Chereskin was a large person who weighed close to 250 pounds that a pixil stent measuring 2.5 millimeters in diameter was too small.  In Dr. Wolff's opinion, there is only a rough correlation between body size and the size of a person's coronary arteries, and a cardiologist would never determine the size of stent to use from the size of the patient.  Dr. Wolff concluded from his review of the video of the angioplasty that Dr. Ptacin properly performed the

16

procedure within the standard of care for an interventional cardiologist and achieved an excellent result. Blood flow was restored and the result was excellent. Dr. Wolff testified that the fact that Chereskin suffered an acute stent thrombosis shortly thereafter did not mean that the procedure was negligently performed because that particular complication is known to occur in roughly 1% to 2% of the cases.

25. Dr. Wolff also rejected Dr. Fergus' assertion that Dr. Ptacin erred in failing to inject nitroglycerine directly into the artery to counteract the effects of adrenaline, which may have increased in response to the initial heart attack and the accompanying stress. Adrenaline could have constricted Chereskin's arteries and, according to Dr. Fergus, Dr. Ptacin should have recognized this possibility and used nitroglycerine to relax the artery so that he could determine its full width. Dr. Wolff testified, however, that injection of nitroglycerine into the artery was not normally done, there was no evidence that doing so led to a better result, and it was not routinely done at the University Hospitals where he performed or oversaw many such procedures.

26. I again find that Dr. Wolff's testimony is more persuasive as to the standard of care for interventional cardiologists and conclude that Dr. Ptacin was not negligent. If as Dr. Fergus suggests, Chereskin's arteries were constricted as a result of adrenaline, the smaller stent would have seemed to a reasonable physician the right size. And if the standard of care at the time did not call for the injection of nitroglycerine directly into the artery under the circumstances, as Dr. Wolff indicated, Dr. Ptacin cannot be faulted for not using a larger size. It is true that Dr. Silberman also thought that the stent appeared small. But he came to this view late. Dr. Silberman initially thought that the stent became clogged because Chereskin did not receive appropriate anticoagulation therapy, an issue I address below. (Ex. 25B.) He later concluded that the stent was too small from

17

his review of the video of the procedure. No other physician, however, not even Dr. Fergus, was able to say from the video that the stent was undersized. This is not to say that the stent was in fact the right size. The fact that Dr. Buchanan, the cardiologist who performed the second angioplasty at Appleton Medical Center two days later used a 3 mm. stent, which he inflated to 3.5 mm., certainly suggests that a larger stent should have been used (although Dr. Wolff testified that even that fact does not demonstrate that the stent used by Dr. Ptacin was too small). I am not convinced, however, that a cardiologist exercising reasonable care would have known at the time Dr. Ptacin was performing the procedure that a larger stent was called for. In other words, it may be that the acute stent thrombosis that Chereskin suffered was caused by an undersized stent. The knowledge and experience of Drs. Silberman and Fergus may exceed that of most reasonable cardiologists; their own standards may exceed the norm. A doctor is not negligent, however, for failing to meet the highest degree of care, skill, and judgment or solely because a bad result may have followed his or her care and treatment. Dr. Wolff's experience as a physician who performs some 250 such procedures per year, who teaches and publishes extensively on the subject, and who serves on one of the committees that establish and review the ACC/AHA Guidelines leads me to place greater weight on his testimony as to the appropriate standard of care in determining the size of the stent to use in performing PCA.

27.    Dr. Fergus and Dr. Silberman also testified that after the procedure was performed there were clear indications that something was wrong. Both testified that the fact that Chereskin experienced chest pain following Dr. Ptacin's completion of the procedure was a red flag that something was wrong and should have alerted medical personnel. In addition, Dr. Fergus testified that the fact that an EKG was done at 3:30 the next morning indicates that Chereskin was still

18

complaining of chest pain, notwithstanding the absence of any notations indicating such in the chart. According to Dr. Fergus, hospitals do not wake patients up at 3:30 in the morning to perform EKGs absent a complaint of chest pain. Dr. Silberman likewise thought Chereskin complained of chest pain throughout the night following the PCA. Both Drs. Silberman and Fergus also testified that the EKG obtained at that time was abnormal, providing further evidence that something was wrong. Under these circumstances, both doctors testified that the cardiologist should have been notified and Chereskin should have been returned to the cath lab for further examination. At the very least, in their opinion, he should not have been discharged on the afternoon of the day after the procedure was performed.

28.     I find, however, that Chereskin did not complain of chest pain throughout the night following his angioplasty. Upon completion of the procedure, Chereskin was returned to the ICU. At approximately 4:00 p.m., Nurse Beronja conducted an assessment, and Chereskin complained of chest pain, rating it as a 3 on a scale of 1 to 10. (Ex. 1010.) Nurse Beronja stated it was common in her experience for patients who underwent angioplasty to have minor chest pain shortly after the procedure because of the profusion of the coronary arteries when the blood flow is restored after they are opened up and because the arteries are manipulated during the procedure. There was a standing order for nitroglycerin, and in response to Chereskin's report Nurse Beronja restarted the nitroglycerin drip. Her note on the patient flow sheet states that he "was pain free since." (*Id.*) The flow sheet indicates that the drip was turned off at approximately 10:00 p.m., shortly before Nurse Beronja went off duty. The patient flow sheet also indicates that Nurse Berongia administered morphine to Chereskin at approximately 7:15 p.m., but that was a prophylactic measure to alleviate any pain he could have during the process of removing the sheath that had been inserted into the

19

artery in his groin area as part of the catheterization process. It was not in response to a complaint of chest pain. Other than the initial report of pain shortly after the procedure at approximately 4:00 p.m. on December 2, the hospital records and nursing notes reflect that Chereskin made no further complaints of chest pain or any other pain throughout his stay at Zablocki VAMC.

29. Contrary to Dr. Fergus' assertion that the only reason an EKG would have been done at 3:30 in the morning, David Carroll, the critical care nurse who cared for Chereskin during the midnight to 8:00 a.m. shift, testified that it was standard protocol at Zablocki to do an EKG on all cardiac catheterization patients the following day. He testified that because Zablocki VAMC was a teaching hospital, the EKG was generally done at the same time as the "morning labs" so that the results would be available when the teaching physicians, residents and interns made their early rounds. Pointing to the patient flow sheet, Nurse Carroll noted that his labs were done at 3:35 a.m., about the same time as the EKG. Nurse Carroll, like the other nurses, explained how chest pain complaints would have been documented if there had been any. The patient flow sheets on which they documented their work and the patient's vital signs, condition and complaints were stamped with the word "PAIN" to remind the nurses to regularly inquire whether the patient was experiencing any pain. Other than the initial complaint shortly after Chereskin arrived back at the ICU, the flow sheets for December 2 and 3 indicated no other complaints. (*Id.*, Ex. 1011.)

29. Chereskin's recitation of the events following the procedure differed markedly from the testimony of the nurses who cared for him and the hospital records. He testified that on the evening after the procedure he was having chest discomfort and advised the nurse of that fact. He said in response, she increased the nitroglycerine and gave him morphine. He testified that he again experienced chest pain in the middle of the night or early morning and "hit the button" to alert the

20

nurse. He testified that he thought the nurse again increased the nitroglycerine. An intern attempted to do an echocardiogram, he stated, but was unable to complete the test because the machine did not work. He had no recollection of the early morning EKG that was done and testified that the only doctor he saw before he left was Dr. Irna Konon, an internal medicine resident who gave him his discharge instructions. Although the hospital chart indicates he consumed 80% of a clear liquid breakfast and 100% of a low fat, low cholesterol and low sodium lunch, he claimed all he ate was an apple which a male nurse had given him from his own lunch that morning.

30.     Chereskin also described a disturbing account of his discharge and the trip back to his home on December 3. He was told he would be discharged that day at approximately 1:00 p.m. At approximately 3:30 p.m., he was placed in a wheel chair and taken to the bus that regularly transports veterans back to northeast Wisconsin. Chereskin testified that he felt nauseous and tightness in his chest at the time, but has no recollection whether he told the nurses or anyone else how he was feeling. He admits he wanted to go home. He had no clothes with him, but someone bought a pair of jeans and a T-shirt for him at the VA store, and his cousin, who was the bus driver, loaned him a sweatshirt. He emotionally testified that on the way home, the chest pain got severe. When he told his cousin about the pain, his cousin told him he couldn't stop anywhere. Instead, he dropped him off at the Fleet Farm store in Green Bay, and Chereskin called a friend for a ride home. When Chereskin arrived back at his home, he took a shower. Afterwards, he sat down and again experienced severe pain. He then called 911 for emergency medical care and was transported to the Shawano Medical Center. From there he was airlifted to Appleton Medical Center where the second angioplasty and stenting were performed.

31.     Chereskin's version of events is not entirely credible.  To accept his claim that he continued to complain of chest pain after his initial comment to Nurse Beronja would require me to find that several nurses failed to document what each of them clearly knew to be an important indication of his condition and progress.  If, as he claims, they increased his nitroglycerine and administered morphine in response to his complaints, I would have to further find that they failed to document these events as well.  His claim that he was given nothing to eat but an apple is likewise belied by the records the nurses maintained.  Such actions on the part of the nursing staff would be more than mere negligence; they would amount to a conspiracy to deny Chereskin appropriate medical care.  Nothing in the record supports a finding that the nurses who cared for Chereskin would have engaged in such behavior.  Instead, I found the nurses who testified to be credible as witnesses, and conscientious and competent in their work.  Nurse Beronja specifically recalled Chereskin, despite the number of years that had passed since she cared for him.  She testified that he was particularly memorable because he was a relatively young man to have suffered a heart attack from coronary artery disease and because of his unique personal circumstances.  She noted that his former fiancé and current girlfriend were both visiting him, which had created some unusual family dynamics.  During the sheath removal process, Nurse Beronja testified that she was required to remain with Chereskin for approximately 30 minutes to monitor his condition and, during that time, he engaged in "a bit of story telling."  Her testimony was entirely credible and consistent with Chereskin's personality manifested during the trial. Plaintiffs offer no explanation why these nurses would have deliberately failed to accurately document Chereskin's complaints and the care they provided.

22

32.     Chereskin's description of how he was feeling on the bus ride home also lacks credibility.  It is difficult to believe that a bus driver for a medical facility, let alone his own cousin, would have simply dropped him off at a store and not sought medical help for him if he was having severe chest pain so soon after such a procedure.  It also seems odd that after experiencing such pain, Chereskin would have had his friend take him home instead of drive him to a hospital in Green Bay.  Chereskin's testimony that he was experiencing pain on the way home from Zablocki VAMC is also inconsistent with the records of the emergency response team that transported him to the Shawano Medical Center where he was first evaluated and the Center's own records, both of which indicate that the onset of pain was at about 9:00 p.m. on December 3.  There is no mention of chest pain on the bus trip back to Green Bay.  For all of these reasons, I find that Chereskin's sole complaint of chest pain was as described by Nurse Beronja at approximately 4:00 p.m. shortly after the procedure, and that he was pain free from that time until he arrived home.

33.     Dr. Wolff confirmed Nurse Beronja's testimony that Chereskin's initial report of chest pain after the procedure did not warrant immediately notifying the cardiologist.  He testified that minor chest pain following angioplasty is very common and is typically treated "reflexively" by nurses with nitroglycerine.  Dr. Wolff testified that such chest pain is often caused by the stretching of the artery that occurs during the procedure or spasms that can occur afterwards.  In contrast to Drs. Silberman and Fergus, he testified that there were no EKG changes at that time that were consistent with acute stent thrombosis, which he described as an all-or-nothing phenomenon.  In other words, it comes on suddenly with no forewarning.  The type of pain addressed by Nurse Beronja shortly after the procedure, in Dr. Wolff's view, would not have put a reasonable cardiologist on notice that the patient should be returned to the cath lab.  Dr. Wolff also found

23

nothing unusual about an EKG being done at 3:30 a.m. and found no abnormalities in that EKG or the one shortly after the procedure. Both EKGs showed the normal sequela he would expect following the initial heart attack Chereskin had before he presented at the Iron Mountain VAMC. Finally, Dr. Wolff testified that the decision to discharge Chereskin in the afternoon of December 3, 2002, was reasonable and within the standard of care for cardiologists, given a successful angioplasty and the absence of any indications of a problem. Dr. Wolff testified that Chereskin would have been treated the same way at the University of Wisconsin Hospital. Indeed, it appears he was discharged from Appleton Medical Center on December 5, the day after the same procedure was performed there on December 4, 2002.

34. Dr. Ptacin provided some support for the opinion of Drs. Silberman and Fergus that it was negligent for the medical staff not to notify the cardiologist who performed the procedure that Chereskin had chest pain after he was returned to the ICU. Dr. Ptacin testified he would want to have known of this fact, and if told of it, would have ordered an EKG and examined him. Karen Duce, Plaintiffs' nursing expert, likewise testified that the nurse on duty when Chereskin complained of chest pain following the angioplasty should have notified the cardiologist. Dr. Ptacin also testified that it would be a reasonable practice not to discharge a patient who underwent a stenting procedure for at least twenty-four hours after chest pain requiring nitroglycerine for relief. Dr. Ptacin was not testifying as to the proper standard of care, however. Dr. Wolff, on the other hand, testified that he had never heard of such a protocol at any VA hospital and none existed at his hospital. He also thought that whether a nurse should notify the doctor of such an occurrence depends on the instructions the doctor has given the nurse. There is no evidence that Dr. Ptacin ever instructed the nursing staff to notify him upon any complaint of chest pain following PCA. In any

24

event, the chest pain appears to have quickly resolved, and there were no further complaints of chest pain after the initial complaint throughout the evening and the following day prior to Chereskin's discharge at 3:30 p.m., almost a full twenty-four hours later. It therefore appears doubtful whether notifying the cardiologist of Chereskin's initial complaint of chest pain would have made any difference in his care and treatment.

35. Again, and for the reasons described above, I find Dr. Wolff's testimony more convincing on the proper standard of care for cardiologists. While I find Dr. Fergus and Dr. Silberman to be excellent cardiologists, I find that Dr. Wolff's background and experience render him a more reliable guide as to the standard of care for cardiologists in general. Moreover, Dr. Fergus and Dr. Silberman both seem to have assumed that Chereskin was complaining of chest pain throughout the evening and even the following day, an assumption I have expressly rejected for the reasons set forth above. Dr. Silberman, and perhaps Dr. Fergus as well, were also under the impression (mistaken as I conclude below) that Chereskin was not given the proper dose of anticoagulants following the procedure. These assumptions, I conclude, may have colored their assessment of the care provided at Zablocki VAMC and their opinions as to the cause of the acute stent thrombosis.

36. I am also concerned that Dr. Fergus may be such a strong advocate for his patient that this relationship may unconsciously influence his testimony. For example, he rejected out of hand the possibility that an early morning EKG could be done for any other reason than in response to a complaint of chest pain. Yet, I found Nurse Carroll's explanation that this was normal practice at a teaching hospital such as Zablocki convincing. To accept Dr. Fergus' testimony on this narrow question, I would have to believe that Nurse Carroll not only lied under oath, but also failed to

25

document Chereskin's complaints of chest pain during his shift. Nurse Carroll, like the other medical staff members who testified, struck me as conscientious and honest individuals. I find no evidence to support the allegations that they would have ignored clear evidence of problems or altered records to compromise a patient's health.

37.    Dr. Fergus seemed to advocate for his patient in other areas as well. He testified concerning Chereskin's future medical expenses, including the cost of future office visits, stress tests, and even angioplasty or possible by-pass surgery. Yet, Chereskin's coronary artery disease and initial heart attack at age 44 pre-existed any treatment by the defendants and would seem to be the cause of most, if not all of the future medical care he was asked about. Dr. Fergus conceded as much with respect to future angioplasty that may be needed to treat additional blockages that have since formed in his coronary arteries. Similarly, the testimony indicates that angina is caused by blockage of the artery. It thus would seem to follow that the angina that Chereskin has recently reported is caused by the newly discovered blockage in other areas of his coronary arteries. Yet, in concluding that Chereskin should no longer work as a trial attorney because of the angina he has experienced in the courtroom, Dr. Fergus seems to attribute the angina to the weakening of his heart caused by the second heart attack. In his letter to Chereskin's counsel of February 18, 2008, Dr. Fergus stated that whether he would have to retire depended on his success in controlling the progression of his coronary artery disease, which in turn was largely dependent on his control of his risk factors, including smoking, diet, and exercise. (Ex. 27.) Shortly before trial, Dr. Fergus reached the conclusion that Chereskin should no longer work as a trial attorney, and despite evidence that Chereskin has failed to take steps to control at least some of his risk factors (he still smokes, weighs close to 270 pounds, and his cholesterol is too high), Dr. Fergus attributes his

26

current difficulties almost entirely to the second heart attack, as opposed to the progression of his underlying coronary artery disease. All of these considerations lead me to place greater weight on Dr. Wolff's opinion as to the proper standard of care.

38.     This is not to say that the second heart attack did not cause substantial damage to Chereskin's heart. The nuclear ventriculogram Dr. Fergus submitted as part of his supplement to his testimony (Dkt.# 80) dramatically shows the weakness in his heart. Dr. Silberman testified to this fact as well. Dr. Fergus described the manner in which remodeling of the heart occurs in response to weakening caused by a significant heart attack. There is no dispute that the second heart attack caused substantial damage. Based upon the evidence presented, however, I am not convinced that the second heart attack was caused by the negligence of the medical staff at Zablocki VAMC. From the testimony of Dr. Wolff, who I find the most credible of the physician experts on the applicable standard of care, I conclude that the medical care provided to Chereskin was within the standard of a reasonable cardiologist, as was the care provided by the medical staff in general. At least, Plaintiffs have not convinced me to the contrary.

39.     Finally, I also reject Plaintiffs' allegation that the nursing staff failed to administer to Chereskin the proper amount of anti-coagulant after the angioplasty was performed. Dr. Ptacin prescribed 18 hours of Integrelin following the procedure, which all three cardiologists agreed was reasonable, and the records reflect that the first intravenous ("IV") bottle was started at approximately 2:30 p.m. on December 2 before he left the cath lab. The patient flow sheets indicate that Chereskin continued to receive Integrelin via IV infusion until approximately 8:30 a.m. the following morning. Other medications that were prescribed were properly administered as well. Plaintiffs' contention to the contrary was understandable, given the poor state of many of the records

27

and the difficulty counsel for the Plaintiffs encountered trying to obtain a complete set of records. The transition from paper to electronic records over the relevant time period resulted in a mixture of both paper and computer generated records which, absent the testimony of staff, were difficult to decipher. It also led to problems in retrieval of records. Having heard the testimony and examined the records, however, I am satisfied that Chereskin received the proper amounts of Integrelin and other prescribed medications.

## CONCLUSION

40.     Having found that the care provided Chereskin by the Iron Mountain and Zablocki VAMCs was within the standard for the physicians and nurses who attended him, I conclude that the government is entitled to dismissal of all claims against it. The clerk is directed to enter judgment in favor or the government forthwith. Costs, however, are denied. Given the time and expense Plaintiffs' counsel incurred in obtaining complete records, it would be inappropriate to award costs to the government.

**SO ORDERED** this _____22nd_____ day of March, 2010.

_  s/ William C. Griesbach_____
William C. Griesbach
United States District Judge

28