UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAMES CHERESKIN,
ELIZABETH CHERESKIN,
& ANDREW CHERESKIN,

        Plaintiffs,

v.                                              Case No. 06-C-1269

UNITED STATES OF AMERICA,

        Defendant.

## DECISION AND ORDER

        In this case, which arises under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), Plaintiff James Chereskin alleged that he received negligent medical treatment from VA medical staff after suffering a heart attack in December 2002. After a trial to the Court, I concluded that the medical care Plaintiff received was not negligent, and I issued findings of fact and conclusions of law and ordered entry of judgment in favor of the Defendant. Pursuant to Fed. R. Civ. P. 60(b)(3), Plaintiff now alleges fraud and moves to vacate the judgment and for sanctions. For the reasons set forth below, the motion will be denied.

        The validity and interpretation of Plaintiff's medical records has been a recurring issue in this case, and the issue once again underlies Plaintiff's allegation of fraud. "For relief under Rule 60(b)(3) the victim of the fraud or other misconduct need show only that it affected his ability to present his case, not that he would have won had the fraud or misconduct not occurred." *Ty Inc. v. Softbelly's Inc.,* 353 F.3d 528, 536 (7th Cir. 2003). Plaintiff asserts that the computer program

used by the Department of Veterans Affairs to produce patient records was defective, which resulted in the creation of patient records containing incorrect data. The resulting inaccuracies were manifest in medical records the government produced in 2008. These records were relied on by Defendant's expert, Dr. Wolff, and thus Plaintiff now argues that Wolff's expert testimony was unreliable because it was based on inaccurate data. Plaintiff alleges that the government committed fraud by failing to disclose that the new computer records were produced using a "flawed malfunctioning computer program that was known to produce inaccurate patient records." (Pl. Br. at 3.) Allowing the judgment to stand, Plaintiff argues, will reward the government for its fraud and allow it to alter medical records in other cases in order to combat allegations of physician negligence. Accordingly, he asks that judgment be awarded to him as a sanction for the government's fraud. He also asks that the government be ordered to pay his attorneys fees and costs.

Plaintiff's fraud allegation comes within a hair's breadth of asserting that government agents tampered with medical records and created a medical record that would withstand a negligence challenge. In an earlier decision and order addressing this issue, I described the allegation as one involving "essentially a criminal conspiracy on the part of government actors to manufacture evidence." (Dkt. # 62 at 6.) In addition, I noted some concern that Plaintiff's extremely serious allegations were largely unsupported:

> Plaintiffs have accused long-term federal employees of massively overdosing a patient and then covering it up. These are not just discovery abuses but felonies. One would think that such an accusation would be based on more than a nurse's interpretation of a cryptic notation in a six-year-old medical record. With only the barest of inferences supporting this claim, the bald accusation is nearly as troubling as the underlying allegations themselves.

(*Id.* at 7.)

2

Despite this Court's earlier concerns, Plaintiff persists in making serious allegations that remain wholly unsupported. The twist is that Plaintiff now relies on a report issued by the VA's Office of Inspector General ("OIG") that he asserts undermines the validity of the medical records the government produced in 2008. Although his brief does not actually cite the OIG report, he claims it constitutes "new evidence of VA computer malfunctions." (Pl. Br. at 7.) Plaintiff does not explain in any detail the nature of these "malfunctions," nor does he explain how computer programs created incorrect patient data. The reply brief refers to the OIG report's exposure of "systemic on-going computer records defects," and it states that there is an "obvious correlation" between what the report uncovered and Plaintiff's medical records. Even so, the Court is still left to discern this obvious correlation for itself. The truth is that there is no correlation: the OIG report simply has nothing to do with this case.

The OIG report analyzes the VA's preliminary testing in advance of the rollout of a new computer software program, called CPRS v27, in 2006, 2007 and 2008. CPRS is an integrated patient data management program that incorporates all information connected with the patient and allows clinicians to order tests, medications or procedures for that patient through the program. (Dkt. # 88 at 2.) In particular, the report addressed concerns that a software glitch had caused several patients' intravenous infusions to be been continued after the infusion was no longer required, although there was no indication of harm to any patients. In addition, the report assessed the development of the CPRS project and problems arising out of the VA's limited alpha and beta testing of the product at ten medical facilities around the country.

Soon after CPRS v27 was released in August 2008, a problem with patient records was noticed. When a clinician switched from one patient's record to another, the data from the earlier

3

patient could still sometimes appear in the new patient's display. (*Id.* at 4-5.) Although that phenomenon caused confusion, no reports of patient harm were received. Moreover, the OIG report noted that "it was determined that the integrity of the medical record was not compr[om]ised because of this software defect." (*Id.* at 5.) By November 2008, a software patch was issued that solved the problem.

In sum, the report describes the problems associated with the implementation of version 27 of a VA patient records system. It notes that the principal problem was noticed in September 2008 and fixed two months later. No underlying medical records were compromised and no patients were harmed. The report offers suggestions for ways the VA can conduct more thorough software testing prior to rollout. But nowhere is there anything in the report that is probative of the veracity of Plaintiff's own medical records, which date to several years prior to CPRS v27. The OIG report says nothing about the computer system producing inaccurate medical records. It is thus unclear how the OIG report bears on this action or why the government committed "fraud" in failing to disclose the existence of the report.

Plaintiff also makes two cursory arguments about other information the government allegedly withheld, but these one-sentence arguments are fatally undeveloped and provide no basis for relief. (Pl. Br. at 6.) The first concerns the fact that the DVD containing the video of the angioplasty procedure performed at Zablocki VAMC that was provided to Plaintiff by the defense did not show the diagnostic portion of the procedure. This became apparent during the testimony of Dr. Wolff when he attempted to demonstrate a point using the Plaintiff's DVD that had previously been introduced. After it was determined that the omission was entirely inadvertent, the Court kept the record open and offered Plaintiff the opportunity to have his own expert view a DVD

4

that included the diagnostic portion and offer further testimony if the additional information changed or buttressed his expert's opinion in any way. Instead of offering additional testimony, Plaintiff elected to offer a supplemental report from Dr. Fergus, his primary expert, which was essentially a rebuttal of Dr. Wolff's testimony. (Dkt. 80-1.) Although there was nothing in Dr. Fergus' supplemental report that suggested that the diagnostic portion of the procedure had any bearing on his testimony, the Court fully considered the supplemental report. Having been given an opportunity to respond to the inadvertently withheld evidence, there is no basis for Plaintiff to now argue he was prejudiced by the failure to provide the complete video earlier.

Plaintiff's last complaint is that the original EKG from the early morning following the procedure was not produced at trial. Instead of the original, the file contained a copy of the EKG strip. Plaintiff argues, without any basis in the record as far as the Court can determine, that the original would have disclosed the "real" reason the early morning EKG was ordered, as opposed to the reason given by the nurse who ordered it. This issue was raised at trial, however, and could have been fully explored then. Plaintiff did not seek a mistrial or request additional time to address it. Having waited until the Court entered its decision, the issue is waived.

Accordingly, for the reasons set forth, the motion to vacate the judgment is **DENIED**.

**SO ORDERED** this     26th     day of May, 2010.

                                                  s/ William C. Griesbach
                                                  William C. Griesbach
                                                  United States District Judge